Moncure, P.
delivered the opinion of the court. •
This is an appeal from a decree dissolving an injunction to an execution upon a judgment, on the ground that the judgment had been satisfied by payment. The alleged payment consisted in a' deposit in a bank at ’Wytheville, in July 1862, of the amount of the judgment, in depreciated bank notes and Confederate States treasury notes at their par value, of which deposit and of the purpose thereof the creditor "was shortly thereafter informed by the debtor and made no objection. The depreciation of the notes, in which the deposit was made, was, at the time of the deposit, at the rate of one and a half for one, as compared with specie. Though this was a small depreciation, compared with what soon thereafter happened, in regard to such notes; and though such notes were then often received at par, in payment of old debts, and were the general currency of the country ; yet a creditor was not bound to receive them at par in payment of the debt due to him ; and his consent to do so, especially when his debt was undisputed and perfectly secure (as seems to have been the case here), ought to be clearly proved, in order to be binding upon him. And even if the deposit had been made in good money, current at par, yet if the deposit was made to the credit of the debtor, or on his account, and not to the credit of the creditor, or on his account; if anything remained to *353 be done after the creditor was informed of the deposit, to invest him with the title to the. money; and if, before that thing was done, the money perished, the loss would fall on the debtor ; unless it arose from the default of the creditor, or some fraud on his part, by which the debtor was misled.
If the version given of this transaction in the answer of the creditor be the true one ; or, if the case were tried upon the bills and answer only, there would be no doubt as to the correctness of the decree in favor of the creditor. But the case was tried, also, upon the depositions of the debtor and his sou; and the question is, howT upon the whole case as tried, the question ought to have been decided.
It was argued by the counsel for the appellee, that the answer, where it is responsive to the bill, must be taken to be true, because it is not contradicted by at least two competent witnesses, or one with corroborating circumstances.
"Whether the answer, where it is responsive to and denies the allegations of the bill, is contradicted by at least two competent witnesses, or one with corroborating circumstances, seems to depend, upon whether the debtor, the plaintiff himself, is a competent witness within the meaning of the rule of equity on the subject: that is, whether his evidence can have any weight in disproving the responsive denials of the answer.
That is certainly a very interesting question, and seems to be an undecided and novel one. To give weight to such evidence for such a purpose, might seem to go far in annulling the equity rule or limiting its operation.
Without, however, expressing any opinion upon that question, and not giving to the answer a conclusive effect in any respect, but looking to all the evidence in the case, let us enquire whether it shows, either that the judgment has been actually paid, or that the creditor is equitably estopped from denying its payment ?
*354 J. Melton Moore, the son of the debtor, testifies, that in the summer of 1862, he paid the money to the clerk of the County court of Wythe, H. S. Mathews. Witness says: “ The sheriff told me to pay it to Mr. Mathews. I paid $650 in bank notes, the remainder in Confederate money. Colonel Moore (the debtor) was-sued ou the amount due Mr. Tate (the creditor) ; therefore I went to the sheriff to know what to do with the money. He advised me to pay it to the clerk. Mr. Tate was not a resident of the county. Colonel Moore was in the army at that time ; and wrote to me to pay the money due Mr. Tate. I paid the amount of the judgment.” Being asked, on his examination in chief, “How soon did Mr. Tate, to your knowledge, have knowledge of your payment; how did he come to have that knowledge; and what was his conduct on learning it?” The witness answered : “I met in town (that is in Wytheville), either at the next term of the County court afterwards, or at the next but one, Mr. Tate himself, and told him I had paid the money to Mr. Mathews, and that Mr. Mathews had deposited it in the-Southwestern Bank of Virginia, in Wytheville, for him. Mr. Tate made no objection and we parted. This interview was in Wytheville.” Being further asked: “ When did you first learn that Mr. Tate had objection to taking the money ; and how did you learn it ?” Witness answered : “ The first I knew of his objecting was after the death of Mr. Mathews ; and I think it was in the fall of 1864. Captain Gibboney, the administrator of Mr. Mathews, at that time inquired of me, whether I had ever paid such a sum to Mr. Mathews for Mr. Tate, stating that it so appeared from a memorandum of Mr. Mathews, and that he had found it on deposit accordingly, and had tendered it to Mr. Tate, who had refused it; Thereupon said Gibboney insisted, as representative of Mathews, on paying it back to me ; and not seeing how else it could be saved, I received it.” Being asked, *355 on cross examination : “ When yon had the conversation with Tate, did he tell you that he would receive the money?” The witness answered: “I told him the money was in the bank and walked off. He, Tate, said nothing. He did not object to it; nor did he say he would receive it. I was in his company at other times afterwards during the day ; he never said he would receive, nor did he say he would refuse to take it.” And being further asked : “When Captain Gibboney offered you the money, did you take it; and was the money used by Colonel Moore afterwards?” Witness answered : “I took the money and kept it until after the surrender ; it was then sold for specie and used.”
A. C. Moore, the debtor, testifies, that he was a colonel in the Confederate service. His instructions to his son when he left home were, to pay the Tate debt out of the first funds his son should acquire during his absence. Witness went to Kentucky, and on his return drew funds from the Confederate government amounting to $1,470 or $1,570, and sent all except $70 to his son. This was the last of February or 1st of March 1862. Sent the money to his son with instructions to pay the debt to Tate, not knowing whether he had been paid or not. Thinks the money sent was Confederate money. Being asked, “ When and how did you first learn that Melton Moore (the son) had made the payment directed ?” The witness answered: “ I met with Mr. Tate at AbiDgdon, though he was possibly living in Smyth county. We were talking about the débt, and he informed me that the money was deposited for him in the bank at Wytheville. From his conversation I inferred that it would be all right, and knew nothing to the contrary until after the death of Mr. Mathews. My impression is, that this conversation took place a short time before I went with my regiment into Kentucky, and that it was in the fall of 1862. We started from Abingdon the 3d of Hovember in that year. He did not merely inform me that he *356 had learned the money was deposited for him in the hank, but that it was so deposited.” Witness says, he never knew anything of any objection Tate had to the supposed payment until he heard it as reported by Captain Gibboney, administrator of Mr. Mathews. This witness was twice examined in the case. Being asked, on. his second examination, to ‘4 state what convei’sation took place in that interview (meaning the one between him and Tate before referred to), and how such conversation originated,” witness said: “ My impression is, that meeting with Mr. Tate, and not knowing whether he had received the money or not, I made enquiry of him to learn whether he had received it or not. He informed me that he had not; but that it was deposited for him in the Southwestern Bank at Wytheville, Virginia. I have no recollection of any other conversation in regard to it. When I parted with him, I was perfectly satisfied that the debt was settled, and never learned that Mr. Tate considered it otherwise until 1864.” Being asked, on cross examination, “Bid Mr. Tate tell you, in hcec verba, that he would receive this money in satisfaction of this judgment?” Witness answered: “ He did not, but left me under the impression that be would take it.”
How, does the foregoing testimony, especially when viewed in connection with the denials of the answer, make out a case either of payment, or of an equitable estoppel to deny payment of tbe judgment aforesaid ?
The judgment was a debt of record, and seems to have been perfectly secure. The creditor might at any time, it seems, have made his money at once by sueing out execution upon the judgment, except so far as the stay law may have interposed a temporary obstruction. And he might have demanded specie in payment of the debt. Indeed, without his consent, nothing but specie would have been a good payment. The debtor contends that he paid the debt in a depreciated currency ; which the creditor does not admit, but denies. How nothing is *357 more reasonable than to require clear proof of such payment under such circumstances. The burden of the proof rests entirely upon the debtor. The laboring oar is upon him. The creditor’s claim is well secured ; is well attested ; may be easily, and readily enforced—transit in rem judicatam.'Execution only, remains to be done. He may safely repose upon his rights ; taking care, of course, to commit no fraud, by anything he does or says, upon the rights of the debtor.
How, let us see what is the evidence of payment relied on by the debtor. It is not pretended that payment was ever actually received by the creditor, in whole or in part, in good or in bad money. It is not pretended that the depreciated money, which was handed by J. Melton Moore, the debtor’s son, to H. S. Mathews, clerk of the court, and by the latter deposited in bank for the purpose of paying the debt, ever came to the hands of the creditor*. It Í3 not pretended that the creditor ever authorized the sheriff, or the clerk, or anybody else, to collect or receive the amount of the debt for him. He seems to have been willing, if he did not prefer, to let the debt stand as it was until the currency became better. Perhaps, like most other persous at that time, he might not have refused payment in Confederate currency, if it had been tendered to him ; but he, no doubt, preferred that such tender should not be made. The only evidence of payment is, that J. Melton Moore, having received from his father Confederate notes exceeding the amount of the debt, with instructions to pay this debt, and supposing that there was an execution for it in the hands of the sheriff", offered to pay the amount to the sheriff"; who, having no execution on the judgment in his bauds, and no authority to receive the money, declined to do so, but advised J. M. Moore to pay the money to the clerk of the court, Mr. Mathews, who received it aud put it in bank. At that time the debtor resided in Wythe, where the judgment was obtained, and the creditor in the adja *358 cent county of Smyth, or the neighboring county of Washington, and both were in the military service of the Confederate States. It does not appear that Mr. Mathews, the clerk, ever informed the creditor, Tate, of the receipt or deposit of the money by him. The first information the creditor received of that fact was at the next term of the County court of Wythe afterwards, or the next term but one ; when J. Melton Moore met the said Tate in Wytheville, and told him that he, Moore, had paid the money to Mr. Mathews, and that Mr. Mathews had deposited it in the Southwestern Bank of Vii’ginia, in Wytheville, for him. “ Mr. Tate,” says the witness, ** made no objection, and we pai’ted.” “ I told him the money was in the bank and walked off. He, Tate, said nothing. He did not object to it; nor did he say he would refuse to receive it.” The money, it seems, remained in bank, without being drawn out by any one, until after the death of Mr. Mathews, in the fall of 1864 ; when Captain Gibboney, the administrator of Mr. Mathews, inquired of witness whether he had ever paid such a sum to Mr. Mathews for Mr. Tate ; stating that it so appeared from a memorandum of Mr. Mathews, and that he had found it on deposit in bank accordingly, and had tendered it to Mr. Tate, who bad refused it. Thereupon said Gibbouey insisted, as representative of Mathews, on paying it back to -witness, who says he received it, not knowing how else it could be saved.
Did this witness, as the agent of his father, do enough to complete the payment of the debt, by merely telling the creditor that the money was in bank, and then walking off? “He, Tate, said nothing. He'did not object to it, nor did he say he would receive it.” Had the witness any right to infer from this silence of the creditor, that he was willing to receive the money deposited, and to accept the mere deposit which had been made as payment of the debt ? 'Why did not witness tell the creditor what kind of money had been deposited, and enquire *359 whether he would receive that kind of money in payment of the debt ? Why did he not get the money from the hank, or from Mr. Mathews, tender it to the creditor, and if accepted, take the creditor’s receipt in full satisfaction and discharge of the judgment ? That was the plain, easy and regular mode of doing the business which the witness ought to have pursued. The witness, the creditor, Mr. Mathews and the bank were all then in the same town together. It would be time enough for the creditor to refuse the money when it should be tendered to him, and he could not be called upon to accept or refuse it until it was so tendered, much less can his acceptance be inferred from his mere silence, on being informed that the money was in bank. The debtor, or his agent, had not a right to pay the money in bank, even to the credit of the creditor, without his consent. It could only be paid to the creditor himself, or to some person by him authorized to receive it, though a subsequent assent would be tantamount to a prior authority. But in this case the money was not deposited to the credit of the creditor, but to the credit of Mathews, the agent of the debtor, and no check was ever given or offered by Mathews to the creditor, and no order on Mathews was ever given by the witness to the creditor for the money. The creditor, without such a check or such an order, had no right to demand or receive the money of the bank, or of Mathews. The money never beeame the property of the creditor, but always remained the property of the debtor until it perished, or was received and disposed of by his agent.
Thus stands the case upon the testimony of J. Melton Moore, the son of the debtor. Is it materially altered by the testimony of the debtor himself, the only other testimony in the case? He says that a short time before he commenced his second march into Kentucky, which was the 1st of October 1862, he met with Mr. Tate at Abingdon. The.account which this witness gives of *360 this interview is as follows: “My impression is, that meeting with Mr. Tate, aud not knowing whether he had received the money or not, I made enquiry of him to learn whether he had received it or not. He informed me that he had not, but that it was deposited for him in the Southwestern Bank at Wytheville, Ya. I have no recollection of any other conversation in regard to it. When I parted with him I was perfectly satisfied that the debt was settled, aud never learned that Mr. Tate considered it othei’wise until 1864.” “He said nothing about taking or'refusing the money then (at the time of the interview aforesaid) or afterwards.” This testimony certainly does not prove a payment of the money, or an admission of such payment. On the contrary, it proves that the money had not been paid to the creditor. “He informed me,” says the witness, “that he had not” received the money, “but that it was deposited for him in the Southwestern Bank at Wytheville, Va.” This was not an agreement by the creditor to accept this deposit as a payment. He had not before accepted it as such, and there was no reason why he should make such acceptance on this occasion. He was merely asked a question of fact, which he answered to the best of his knowledge and belief. The debtor had sent Confederate money to his son, and requested him to pay this debt. The son, it seems, had never informed the’father whether such payment had been made or not; and the debtor and creditor happening to meet at Abingdon, enquiry was made and answered as aforesaid. In informing the debtor that the money was deposited for him (the creditor) in the Southwestern Bank at Wytheville, Va., the creditor meant only to inform the debtor, in answer to his enquiry, of a fact of which the creditor had himsejf been informed by the son of the debtor. He no more intended then to accept that deposit as a payment than he intended to accept it as such at the time he was himself informed of the fact of the deposit. Just as much *361 remained to be done to convert that deposit into a payment of tbe debt after the interview of the debtor and creditor at Abingdon, as after the interview of the debtor’s son and the creditor at Wytheville, as before stated. Nothing was done after either interview towards the application of the money on deposit to the payment of the debt, until after the death of Mathews, when, for the first time, it was offered to the creditor by the administrator of Mathews and refused.
There is not a tittle of evidence tending to prove that Tate, the creditor, was guilty of any fraud in the transaction aforesaid, or intended, by his conduct or his silence, to mislead the debtor or his son. He had no motive whatever to commit such a fraud, as he had an unquestionable right to receive depreciated money or not, at his pleasure, in payment of his judgment—a right of election which he, no doubt, intended to exercise whenever, if ever, such money should be tendered to him. He was not bound to make such election before. Whether the creditor, in July or August 1862, would have received depreciated State bank notes or Confederate notes in payment of his judgment, cannot now be certainly known. He never said that he would, so far as the testimony shows. Perhaps he might have done so, if the said notes had been tendered to him, but they never were. The fact that the creditor said nothing-when informed of the deposit by the debtor’s son, and did not, either then or during the interview with the debtor at Abingdon as aforesaid, say he would receive such notes, or accept the said deposit, in payment of his judgment, ought, it seems, to have excited an apprehension, on the part of the debtor or his son, that the creditor might be unwilling to do so, and to have admonished them of the necessity or propriety of making a tender of the notes, and if received, of taking a receipt in discharge of the judgment; if not, of having satisfaction thereof entered upon the record. If the creditor *362 would have been willing to receive such notes in payment of his judgment, even as late as July or August 1862, he would no doubt greatly have preferred not doing so, as was usual in such cases, and as might fairly have been inferred from his silence when informed of the deposit. Had he been anxious to do so, he would no doubt have at once gone forward aud had the matter perfected by a proper application of the money deposited. But not being anxious to do so, he left it to the debtor, on whom it devolved to make a tender of the notes on deposit in payment of the judgment, reserving to himself the right to receive the money or not, according as he might think best at the time of the tender. The debtor’s son, after informing the creditor of the deposit in bank and walking off, not having done anything more in the matter, the creditor may well have presumed that some other disposition had been made of the money. But however that may be, it devolved on the debtor to make a tender of the notes if he desired them to be received in payment.
The debtor and his son seem also to have acted in good faith in this transaction. They no doubt believed, as the debtor, at least, says he did, that the creditor would receive the money deposited in payment of his judgment. But this belief was not induced by any promise or fraud of the creditor, and he is not bound by any principle of law or equity to make it good. It is ■very much to be regretted that such a loss should have to fall upon one or the other of two parties, both of whom are innocent; but all we can do is to determine on which of them it must fall, according to law. ‘We think it must fall on the party whose property the money on deposit was at the time it perished, or at the time it ■was withdrawn from the hank. And we think we have shown that it remained then, as it had before been, the property of the debtor, Moore, and not of the creditor, ’Tate.
*363 We have, in considering this case, given full credit to the testimony of the debtor and his son, the only testimony in the case besides the answer. But when it is remembered that that is the parol testimony of witnesses whose relation to the controversy, however honest they may be, and doubtless are, must strongly bias their feelings, and wTho are testifying as to conversations which occurred many years before they gave their testimony, the force of it is very much weakened by these considerations, and we must plainly see that it is wholly inadequate to prove the payment of the creditor’s judgment in this case—much less to convict him of fraud— which can never be presumed, but must always be clearly proved.
We therefore think there is no error in the decree appealed from, and that it ought to be affirmed.
Decree arrirmed.